# United States Court of Appeals

## For the Eighth Circuit

_____

## No. 24-3161

_____

Missouri River Energy Services,

*Petitioner*,

v.

Federal Energy Regulatory Commission,

*Respondent,*

Southwest Power Pool; Nebraska Public Power District; Basin Electric Power Cooperative,

*Intervenors.*

_____

## No. 25-1058

_____

Missouri River Energy Services,

*Petitioner*,

v.

Federal Energy Regulatory Commission,

*Respondent,*

Southwest Power Pool; Nebraska Public Power District; Basin Electric Power Cooperative,

*Intervenors*.

—————————

Petition for Review of an Order of the
Federal Energy Regulatory Commission

—————————

Submitted: October 22, 2025
Filed: March 30, 2026

—————————

Before COLLOTON, Chief Judge, LOKEN and BENTON, Circuit Judges.

—————————

COLLOTON, Chief Judge.

Missouri River Energy Services supplies power to municipal electrical utilities throughout Iowa, Minnesota, North Dakota, and South Dakota. On October 1, 2015, Missouri River joined and integrated with Southwest Power Pool, an independent regional transmission organization that manages large portions of the interstate transmission grid and administers real-time energy markets. Southwest also allocates long-term firm transmission rights, which are financial instruments used by load-serving entities to protect against price risks caused by congestion charges that occur on interstate transmission grids.

In 2014, the Federal Energy Regulatory Commission approved Southwest's tariff, a document that established a procedure for awarding annual long-term transmission rights. Under the tariff, long-term rights are allocated annually to eligible entities based on a simultaneous feasibility test that limits the quantity of rights that may be allocated. Once allocated, these long-term rights can be rolled over

into future years.  As required by its tariff, Southwest began allocating all available rights in March 2015, months before Missouri River became a Southwest market participant.  Missouri River has requested long-term rights under this process since joining Southwest's market, but it has never received any.

Missouri River filed a complaint with the Commission, alleging that Southwest violated law by allocating zero long-term rights to Missouri River.  The Commission dismissed the complaint, and Missouri River petitions for review.  We discern no error and deny the petition.

## I.

In organized energy markets, electric energy prices are determined every few minutes at hundreds of locations throughout the transmission grid.  These prices are calculated using locational marginal pricing that accounts for congestion in the grid caused by fluctuations in energy demand.  When a transmission customer purchases energy, the customer is assessed a congestion charge based on the difference in the cost of energy at their requested location and two different locations in the network.  These congestion charges can vary greatly.  To mitigate the risks associated with variable prices, transmission customers may obtain transmission rights that entitle holders to be paid congestion revenues collected for those charges.  *See Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 251 (D.C. Cir. 2007).  Initially, these rights had terms of one year or less, but market participants desired longer term rights that would afford them greater stability.

Missouri River is a "load-serving entity,"—that is, "an electric utility that has a service obligation to end-users."  16 U.S.C. § 824q(a)(1) and (2).  In 2005, Congress amended the Federal Power Act and gave direction to the FERC regarding long-term transmission rights:

-3-

The Commission shall exercise the authority of the Commission under this chapter in a manner that facilitates the planning and expansion of transmission facilities to meet the reasonable needs of load-serving entities to satisfy the service obligations of the load-serving entities, and enables load-serving entities to secure firm transmission rights (or equivalent tradable or financial rights) on a long-term basis for long-term power supply arrangements made, or planned, to meet such needs.

16 U.S.C. § 824q(b)(4). In 2006, the Commission issued a regulation, Order No. 681, to implement the amendment. *Long-Term Firm Transmission Rights in Organized Electricity Markets*, Order No. 681, 71 Fed. Reg. 43564 (Aug. 1, 2006), *order on reh'g*, Order No. 681-A, 71 Fed. Reg. 68440 (Nov. 27, 2006), 117 FERC ¶ 61,201 (2006), *order on reh'g & clarification*, Order No. 681-B, 126 FERC ¶ 61,254 (2009).

Order No. 681 requires transmission organizations to create "tariff sheets and rate schedules that make available long-term transmission rights." Order No. 681, p. 2. The Commission ordered transmission organizations to "ensure that allocated or awarded long-term rights are feasible," and cautioned load-serving entities that the rule "does not necessarily guarantee that a load serving entity will be able to obtain long-term firm transmission rights to hedge its entire resource portfolio or be able to obtain all the long-term firm transmission rights it requests." Order No. 681, pp. 13, 219.

Southwest became subject to the requirements of Order No. 681 in 2012. *See Sw. Power Pool, Inc.*, 141 FERC ¶ 61,048, P 245 (2012). Southwest created a tariff sheet, and the Commission issued a compliance order confirming that Southwest's tariff satisfied the requirements of Order No. 681. *Sw. Power Pool, Inc.*, 149 FERC ¶ 61,076 (2014) (*Compliance Order*), *reh'g denied*, 152 FERC ¶ 61,034 (2015) (*Compliance Rehearing Order*). Under Southwest's tariff, fifty percent of the projected maximum transmission system capacity must be made available for long-term transmission right allocation each year.

Eligible load-serving entities may nominate the long-term rights that they wish to receive, and Southwest will award the "feasible portion of the nominated" long-term rights. Southwest determines the amount of awarded long-term rights based on a simultaneous feasibility test that models how all nominated rights would affect the network if granted. If the amount of nominated long-term rights would exceed what is feasible, then nominated rights are reduced according to a formula in the tariff until the allocation is feasible. Long-term rights may be rolled over into the following year, provided that the receiving entity remains eligible and does not surrender their rights.

In March 2015, Southwest allocated all feasible long-term rights according to the required procedure. Seven months later, Missouri River joined as a tariff customer with Southwest. Missouri River has nominated long-term rights under the tariff since 2016, but it has never received any long-term rights.

In October 2023, Missouri River filed a complaint with the Commission. The complaint alleged that Southwest violated its tariff and Order No. 681 by allocating Missouri River zero long-term transmission rights in every annual allocation since 2016. The Commission determined that Missouri River had not demonstrated any violation under the tariff or Order No. 681 and denied the complaint. Missouri River petitions for review under 16 U.S.C. § 825l(b).

II.

Missouri River maintains that it is entitled to long-term transmission rights under the Federal Power Act, Order No. 681, and Southwest's tariff. Missouri River asks this court to vacate the Commission's decision as arbitrary, capricious, and contrary to law, because the Commission did not order Southwest to provide the long-term rights that Missouri River believes it is due. *See* 5 U.S.C. § 706(2)(a).

-5-

Missouri River contends that it is entitled to long-term rights because the Federal Power Act requires the Commission to ensure that individual load-serving entities "secure" long-term rights to meet their "reasonable needs." 16 U.S.C. § 824q(b)(4). Missouri River's interpretation of the statute is unpersuasive because the text of the Federal Power Act contains no entitlement to long-term transmission rights for individual entities. The statute orders the Commission to "meet the reasonable needs of load-serving entities" and to enable these entities to "secure firm transmission rights." *Id.* This provision requires the Commission to ensure that long-term rights are made available to the class of load-serving entities, but it does not guarantee that every individual load-serving entity must receive them. The statute refers to the needs of "load-serving entities" generally, not to the needs of "each" or "every" load-serving entity. Thus, the statute does not entitle Missouri River to long-term transmission rights.

The Commission's Order No. 681 is consistent with the best meaning of the statute. The order states that specific entities are not guaranteed long-term rights: "[T]his Final rule does not necessarily guarantee that a load serving entity will be able to obtain long-term firm transmission rights." Order No. 681, p. 13. The Commission explained that its order "should not force transmission organizations to provide rights" that "are infeasible," and that organizations must ensure that a long-term right "once awarded, remains viable" throughout its full term. Order No. 681, p. 453, 455. Long-term rights are limited by system feasibility and already-allocated rights, and the allocation of rights to any particular entity is subject to these constraints. Thus, the Commission correctly determined that the Federal Power Act does not entitle Missouri River to long-term transmission rights.

### III.

Missouri River contends the Commission's decision was arbitrary and capricious on various grounds. This court must determine whether the Commission

has articulated "a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The Commission's determination must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). We conclude the Commission's order satisfies this standard.

Missouri River contends that the Commission's determination that Order No. 681 does not require that load-serving entities receive long-term firm transmission rights sufficient to meet their reasonable needs was arbitrary and capricious because it is contrary to the plain text of the Commission's orders. Missouri River asserts that the Commission is required to ensure that "load serving entities have the ability to obtain long-term firm transmission rights," and must "enable load serving entities to secure a reasonable amount of long-term firm transmission rights." Order No. 681 at 101; Order No. 681-A at 17. Nothing in Missouri River's cited language, however, entitles individual load-serving entities to long-term rights. As discussed, Missouri River's reading of the rule is contradicted by its plain text: "[T]his Final rule does not necessarily guarantee that a load serving entity will be able to obtain long-term firm transmission rights." Order No. 681, at 13.

Missouri River also claims that Southwest violated its tariff in the 2015 rights allocation, because it failed to account properly for the impact of parallel flows and miscalculated shift factors during the allocation process. Missouri River contends that these errors resulted in Southwest over-allocating rights to other load-serving entities, such that no long-term rights remained available for Missouri River in the following year. Missouri River argues that the Commission's order was arbitrary and capricious, because the FERC misinterpreted the tariff.

Southwest's allocations of long-term rights did not violate the tariff. The Federal Power Act requires that long-term rights be made available "on a long-term basis" to meet the needs of load-serving entities. 16 U.S.C. § 824q(b)(4). To ensure that rights are available on a long-term basis, Order No. 681 requires that long-term transmission rights must be made available with term lengths, renewal rights, or both. Order No. 681, p. 256. Southwest's tariff complies with this requirement by automatically rolling over long-term rights that were previously awarded if they are not surrendered.

The tariff does not guarantee that any particular load-serving entity will be allotted long-term rights. Instead, it sets forth a process for allocating long-term rights. Under this process, eligible load-serving entities may nominate rights on their desired path. Southwest then must conduct a simultaneous feasibility test to determine whether all nominated rights are feasible. The total nominated rights are not feasible if they will exceed a fifty percent system capacity limit. If the pool of nominations is not feasible, then Southwest is required to reduce each entity's awards until the allocation will be feasible. Once awarded, previously awarded rights can be rolled over into subsequent years if not surrendered.

Before Missouri River became a Southwest tariff customer, existing customers had nominated and obtained long-term rights up to the available feasible capacity. Under its tariff, Southwest was required to honor these customers' rights in subsequent allocation years. Thus, when Missouri River nominated its desired rights in the 2016 allocation cycle, Southwest was obligated to maintain existing rights before allocating any new long-term rights. Since 2016, Southwest has conducted the simultaneous feasibility test and determined that it was not feasible to allocate long-term rights to Missouri River.

The Commission determined that Southwest complied with its tariff obligations in these yearly allocations of long-term rights. *Mo, River Energy Servs. v. Sw. Power*

-8-

*Pool, Inc.*, 187 FERC ¶ 61,188 (2024) (hereinafter "Complaint Order"). The Commission observed that Missouri River had chosen to nominate rights on "one of the most congested constraints" in Southwest's territory, and that Southwest was bound to honor existing rights before allocating new ones. Complaint Order, p. 19. Given these constraints on the system, the Commission determined "it is not unexpected that the simultaneous feasibility test under the [t]ariff would foreclose Missouri River from being awarded [long-term rights] on this path." *Id*.

Missouri River contends that the Commission's decision was arbitrary and capricious, because it did not recognize implementation errors that resulted in tariff violations. First, Missouri River argues that Southwest erred by failing to account for parallel flows in its 2015 rights allocation, and that the Commission's finding to the contrary is not supported by the record. Under the allocation process, Southwest is required to "post the Transmission System network topology, including the corresponding impacts from Parallel Flow, used to determine the projected maximum Transmission System capability that will be used in the upcoming allocation." Missouri River argues that this language requires Southwest to subtract any parallel flow from the transmission system capability used in the yearly allocation of long-term rights. The company contends that Southwest failed properly to account for parallel flow that would have enabled Missouri River to obtain rights in the 2016 allocation. The Commission determined, however, that the tariff language does not require Southwest to withhold any transmission system capability due to parallel flow, and we conclude that the Commission's decision is supported by substantial evidence. Complaint Order, p. 28.

The tariff defines parallel flow as any "[f]low on the transmission system not scheduled with [Southwest] caused by entities external" to Southwest's system. In March 2015, Missouri River had not yet integrated with Southwest, so its demands on Southwest's transmission system constituted parallel flow. Consistent with its tariff, Southwest included the impacts from Missouri River's parallel flow in its

calculation of maximum transmission system capacity for the 2015 rights allocation, and it included those impacts in the posted topology. But Southwest did not set aside system capacity based on Missouri River's parallel flow in the 2015 allocation. Rather, Southwest allocated all available rights to load-serving entities that were already integrated into the Southwest system.

Missouri River contends that Southwest violated the terms of its tariff when it did not withhold any long-term rights based on Missouri River's parallel flow. But the tariff does not require Southwest to withhold any long-term rights based on parallel flows. Instead, Southwest is required only to "post the Transmission System network topology, including the corresponding impacts from Parallel Flow." Southwest posted the required information, and no tariff language required Southwest to reduce the maximum capacity or the amount of long-term rights allocated based on parallel flows. In fact, the tariff required Southwest to "make available fifty percent (50%) of the projected maximum Transmission System capability" for long-term rights allocation. By posting the required information and making available fifty percent of the projected maximum system capacity for long-term rights allocation, Southwest complied with the procedures required by its tariff. Accordingly, the Commission's decision was not arbitrary and capricious, because it reasonably found that Southwest did not violate the terms of its tariff in accounting for parallel flows.

Missouri River also argues that Southwest miscalculated shift factors during its simultaneous feasibility test that contributed to the decision that Missouri River would receive no long-term rights. We conclude that the Commission's order on this issue was supported by substantial evidence.

Shift factors are a component of the simultaneous feasibility test that Southwest conducts in its yearly allocation of long-term rights. Shift factors are used to quantify how a transmission line will react when power is injected and withdrawn at particular points in the system. The values of the shift factors can be positive or negative. In

the simultaneous feasibility test for the 2016 allocation, Southwest calculated a small positive shift factor on a portion of its system.

In Missouri River's administrative complaint, the company alleged that Southwest made an error in calculating a positive shift factor. Missouri River did not allege any flaw in Southwest's calculations or methodology. Instead, Missouri River presented two sets of alternative calculations that yielded small, but differing negative shift factors. Missouri River argued that Southwest must have made an error in its calculation, because Southwest found a positive shift factor but Missouri River and its consultant both calculated negative shift factors.

The Commission determined that Missouri River had not demonstrated that Southwest's calculation was erroneous. First, Missouri River failed to produce any evidence of an error by Southwest. The Commission determined that the discrepancy between the three sets of shift factors was reasonable, because Missouri River's proffered calculations were made on a different software than the software used by Southwest, and "a small shift factor in one direction calculated by one software package could swing to being a small shift factor in the other direction under other software." Complaint Order, p. 28. The Commission further found that there were small discrepancies between the calculations made by Missouri River and its consultant, so all three sets of calculations varied from one another. On this record, the Commission concluded that Missouri River had not demonstrated that Southwest violated or improperly implemented its tariff.

The Commission's decision was supported by substantial evidence. Missouri River's alternative shift factor calculations did not prove that Southwest's calculation was incorrect, because the discrepancies can be attributed to differences in software used by the parties. Missouri River acknowledged that the company and its consultant each used different software to calculate their shift factors, and neither Missouri River nor its consultant used the same software that Southwest employed.

-11-

And Missouri River does not claim that Southwest's choice of software violates the tariff. Accordingly, Missouri River has not established that Southwest's calculations were impermissible.

Finally, Missouri River contends that Southwest's tariff allocation provisions are unjust and unreasonable because the company is entitled to long-term rights. As discussed, however, Missouri River is not entitled to long-term rights under the Federal Power Act, Order No. 681, or Southwest's tariff, and Southwest allocated rights in accordance with the procedures required by its tariff. Where rights on a highly competitive path have already been allocated to eligible load-serving entities, it is not unreasonable that a later-joining customer will not receive a share of these rights. The Federal Power Act and Order No. 681 protect existing rights, and Southwest's tariff protects those entities that have secured long-term rights and declined to forfeit them. Missouri River has not demonstrated that the long-term rights allocation provision in Southwest's tariff is unjust and unreasonable, so the Commission's denial of the complaint is not arbitrary and capricious.

The petition for review is denied.

_____